UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

     v.

ELLA ANDERSON,

              Defendant.

**DECISION AND ORDER**
18-CR-71-RJA

---

     Currently before the Court is *pro se* Defendant Ella Anderson's motion (Dkt. Nos. 88, 116) for compassionate release to reduce her sentence to time served and to release her to home confinement, pursuant to 18 U.S.C. § 3582(c)(1)(A) and as amended by the First Step Act, based on the current COVID-19 pandemic.  The Court has also considered Defendant's reply (Dkt. No. 91) and her voluminous supplemental filings (Dkt. Nos. 91, 92, 95, 99, 108, 110, 111, 116).  The Government opposed the motion (Dkt. No. 90) and has also submitted a supplemental filing with Defendant's updated Bureau of Prisons ("BOP") medical records filed under seal (Dkt. Nos. 118, 119) at the direction of the Court (Dkt. No. 117).  For the reasons stated below, and particularly because the increased risks to Defendant's health do not outweigh the need for her sentence of imprisonment, the Court denies Defendant's motion for compassionate release.

## BACKGROUND

     Defendant was sentenced on July 2, 2019 to an aggregate 78 months of incarceration, to be followed by 4 years of supervised release, after pleading guilty to violating 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 21 U.S.C. § 846 (conspiracy with

intent to distribute, and to distribute, 28 grams or more of cocaine base), and 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2) (felon in possession of a firearm).  (*See* Dkt. No. 57 [Plea Agreement], ¶ 5 [Factual Basis]; Dkt. Nos. 85 [Judgment]; CM/ECF Minute Entry, 07/02/2019).  Defendant is currently housed at FPC Alderson in Alderson, West Virginia, and has a projected release date of April 2, 2024.[1]

Defendant, who is 45 years old, claims that she is particularly vulnerable to severe illness or death from the virus because of a host of medical conditions, and the conditions of her confinement unreasonably expose her to the risk of contracting the virus.  Certainly, the COVID-19 pandemic has resulted in a global public health crisis and national emergency.  "[T]he question of whether compassionate release is warranted during the pandemic remains a dynamic and fact-intensive inquiry."  *United States v. Franco*, 12-CR-932, 2020 U.S. Dist. LEXIS 111169, *2-3 (S.D.N.Y. June 24, 2020).

## DISCUSSION

Under the compassionate release statute, the Court may "reduce the term of imprisonment and impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment."  18 U.S.C. § 3582(c)(1)(A).  It is a defendant's burden to show that he or she is "entitled to a sentence reduction under the [compassionate release] statute."  *United States v. Korn*, 15-CR-81S; 11-CR-384S, 2020 U.S. Dist. LEXIS 62771, *4 (W.D.N.Y. Apr. 9, 2020).

---

[1] *See* "Inmate Locator", Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Mar. 1, 2021).

2

Relief is proper pursuant to 18 U.S.C. § 3582(c)(1)(A) when the following conditions are met: (1) the defendant has satisfied the statutory exhaustion requirement; (2) the Court finds that "extraordinary and compelling reasons" warrant a reduction of the prison sentence; (3) the reduction is consistent with the corresponding policy statements issued by the Sentencing Commission (*see* U.S.S.G. § 1B1.13); and (4) the sentencing factors set forth in 18 U.S.C. § 3553(a) support modification of the prison term, including whether the defendant is a danger to the safety of any other person or the community. *See United States v. Poncedeleon*, No. 18-CR-6094, 2020 U.S. Dist. LEXIS 106890, *1-2 (W.D.N.Y. June 18, 2020).

In considering these elements and factors, "[d]istrict courts have broad discretion in deciding whether to grant or deny a motion for a sentence reduction." *United States v. Tagliaferri*, No. 13-CR-115, 2019 U.S. Dist. LEXIS 205103, *8 (S.D.N.Y. Nov. 25, 2019).

I.   **Exhaustion of Administrative Remedies**

A motion under the compassionate release statute may be made by either the Bureau of Prisons ("BOP") or the defendant, but if it is the latter, only "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A)(i).

The Government concedes that Defendant has exhausted her administrative remedies through the BOP, as Defendant sought compassionate release administratively on May 11, 2020 and her request was denied. (*See* Dkt. No. 118, p. 2;

*see also* Dkt. Nos. 91, p. 25, 92, p. 4, 99, pp. 5-9, 116, pp. 23-37 [initial request and denial, reconsideration request and denial, and denial of appeal by BOP Regional Director]).  The Court concludes that the statutory exhaustion requirement has been met.

## II.     Extraordinary and Compelling Circumstances

The Second Circuit has recently agreed with the majority position of "district courts across the country" that "the First Step Act freed district courts to exercise their discretion in determining what are extraordinary circumstances."  *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020).  Indeed, "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'"  *Id.* at 237-238 (emphasis in original), quoting 28 U.S.C. § 994(t).[2]

Defendant alleges that she is entitled to a sentence reduction primarily because her alleged medical issues, while she is confined at FPC Alderson and subject to the conditions therein, cause intolerable health risks to her health due to COVID-19.  Defendant's argument is essentially based on two grounds:  (1) her history of certain medical conditions place her at "high-risk" of severe illness or complications if she were to contract COVID-19; and (2) FPC Alderson, where she is currently housed, could not adequately treat her if she were to test positive for COVID-19 because it is not

---

[2] Some district courts concluded, before *Brooker*, that two of the application notes to Sentencing Guideline §1B1.13 allow courts to determine that defendants with high-risk medical conditions in the context of the COVID-19 pandemic have established "extraordinary and compelling circumstances".  *See* U.S.S.G. §1B1.13, Application Note 1(A)(ii) (where "defendant is . . . suffering from a serious physical or mental condition . . . that substantially diminishes the ability of defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"); U.S.S.G. § 1B1.13, Application Note 1(D) (where "an extraordinary and compelling reason other than, or in combination with, the reasons described" in the first three categories of the policy statement exists).

adequately treating her existing medical conditions or performing necessary testing to identify possible "high-risk" conditions. In sum, Defendant argues that FPC Alderson is failing to prevent "severe deterioration of her health".

*Alleged Medical Issues*

The Court has carefully reviewed the parties' arguments and the extensive medical records.[3] These records span September 2011 through October 2017 (pre-incarceration records), and August 2019 through January 2021 (BOP records). The Government's most recent filing includes an email from Joseph Dickenson, M.D., the Clinical Director of Health Services at FPC Alderson to the Assistant U.S. Attorney, summarizing Defendant's care. (Dkt. No. 119-2). The Court has reviewed the hearsay email but has assessed Defendant's arguments largely by analyzing the medical records. In addition, despite Defendant's efforts to challenge the veracity of certain medical records (*see* Dkt. Nos. 95-1 and 95-2) (Defendant's handwritten annotations), the Court finds that her lay opinion is not entitled to more weight than the record. Even if Defendant is correct with respect to some of these comments or concerns, her argument that the facility's medical department has done "nothing" to assist her (*see* Dkt. No. 95, p. 7) is contradicted by the treatment, testing, and many medical visits reflected in the records.

For the reasons that follow, the Court concludes that Defendant has not met her burden of establishing extraordinary circumstances warranting a sentence reduction. None of Defendant's documented medical conditions, other than obesity, are identified by the Centers for Disease Control and Prevention ("CDC") as a "high-risk" condition or

---

[3] The medical records are located at Dkt. Nos. 91, pp. 26-29; 95-1; 95-2; 99, pp. 10-15; 116, pp. 39-136, 138-270; 119; and 119-1.

a condition that "might" pose an increased risk with respect to COVID-19.  Defendant's medical conditions appear to have resolved, are being actively treated or managed by the BOP, or are not medically indicated for testing or treatment.

    1)  *Obesity*

The Government concedes that Defendant is obese.  (Dkt. No. 118, p. 2).  The most recent recording of Defendant's height and weight is from October 15, 2020, *i.e.* 65 inches (5 feet 5 inches) and 204 pounds (*see* Dkt. No. 119-1, pp. 13-14), which is a Body Mass Index ("BMI") of 33.9.[4]  Obesity (BMI of 30 or higher, but less than 40) is a condition, according to the CDC, that places individuals at an increased risk of severe illness from the virus causing COVID-19.[5]

    2)  *Cancer in Remission*

Defendant was diagnosed with cervical cancer in 2000 and underwent treatment, and surgery in 2002.  After her surgery the cancer has been in remission, for almost 20 years now.  (*See* Dkt. Nos. 79 [revised presentence investigation report, hereinafter "PSI"], ¶ 109; 116, pp. 58, 74, 93; 119, p. 54, 119-1, pp. 39-40).  The CDC states, "Having cancer currently increases your risk of severe illness from COVID-19.  At this time, it is not known whether having a history of cancer increases your risk."[6]  While is it possible for cancer that is in remission to return, Defendant's cancer has been in remission for a lengthy period, she appears to be receiving regular screenings and

---

[4] "Adult BMI Calculator", Centers for Disease Control and Prevention, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited Mar. 1, 2021).

[5] *See* "COVID-19: People with Certain Medical Conditions", Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Feb. 22, 2021).

[6] *Id.*

6

check-ups to ensure her cancer has not returned, she does not allege any concerning medical conditions in connection with her cancer, and she does not mention her history of cancer as an alleged "high-risk" medical condition as to COVID-19.  Thus, the Court concludes Defendant's cancer (in remission) does not serve as an extraordinary and compelling reason for a reduction in sentence.  Of course, if this situation were to change, or if the CDC's guidance were to change, Defendant could raise the issue in a second/ renewed compassionate release motion.

      3)  *Obstructive Sleep Apnea*

Defendant argues that she has an "urgent need" for a CPAP machine to manage her obstructive sleep apnea and the BOP had not obtained one for her despite her repeated requests.  It is undisputed that Defendant was diagnosed with mild to moderate obstructive sleep apnea that was managed with a CPAP machine before she was admitted to the facility.  (*See e.g.* Dkt. Nos. 79 [PSI], ¶ 109; 116, pp. 89-90, 92, 109, 130-131).  Despite any disagreement between the parties about the reason for the delay in obtaining a CPAP machine for Defendant, it appears from the records that she is now using a machine the BOP ordered for her, at least as of November 29, 2020.  (*See* Dkt. Nos. 91, pp. 26-28, 119, p.1, 119-1, pp. 67-68).

      4)  *Syncope / Blackouts*

Defendant began having blackouts in 2010 and she was diagnosed with "vasovagal" or "neurocardiogenic" syncope, but she reported to the BOP that her last blackout was in November 2018.  (*See* Dkt. Nos. 79 [PSI], ¶ 111; 116, pp. 57, 69, 80, 83, 86-88, 99, 105, 107, 127, 135, 141, 148, 158).  Her BOP records reveal no

complaints regarding her syncope, and her epilepsy/ seizure disorder is noted as "resolved." (*See* Dkt. Nos. 119, p. 77; 119-1, p. 40).

     5)  *Pulmonary Hypertension*

In relation to Defendant's syncope/ blackouts, an electroencephalogram (EEG) failed to show seizure activity, but her echocardiogram (ECHO) showed "mild systolic dysfunction and mild pulmonary hypertension". (*See* Dkt. No. 116, p. 86). "Pulmonary hypertension is a type of high blood pressure that affects the arteries in your lungs and the right side of your heart."[7] This condition is different from hypertension/ high blood pressure, which is higher-than-normal "pressure of blood pushing against the walls of your arteries . . . [that] carry blood from your heart to other parts of your body."[8]

Defendant argues her pulmonary hypertension is not being treated or monitored, and that she needs medication for that condition that FPC Alderson is unwilling to pay for. However, Defendant's mild pulmonary hypertension is not noted again in any of her medical records or in her PSI, and the Court cannot conclude whether treatment is medically required for this mild condition.

     6)  *Vitamin Deficiency*

As to Defendant's deficiency in Vitamin B12 and D, upon admission to FPC Alderson she was taking vitamin supplements, which were initially renewed. However, the prescriptions were not renewed when Defendant's bloodwork showed that her B12

---

[7] *See* "Pulmonary hypertension: Symptoms & causes", Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc-20350697 (last visited Mar. 1, 2021).

[8] *See* "High Blood Pressure: Facts About Hypertension", Centers for Disease Control and Prevention, https://www.cdc.gov/bloodpressure/facts.htm (last visited Mar. 1, 2021).

and D were high or within normal limits.  (*See* Dkt. No. 79 [PSI], ¶ 110; 116, p. 237, 119, pp. 4, 40-41, 119, 151; 119-1, p. 63).

       7)  *Iron Deficiency and Anemia*

Defendant alleges that she has anemia and is deficient in iron.  In 2013 her laboratory results showed "mild anemia" with low iron, and there was a concern in 2014 that Defendant had "microcytic anemia with low iron count".  (*See* Dkt. No. 116, pp. 83, 86).  However, at the BOP, Defendant's iron numbers are within the normal range, and her anemia is listed as "resolved".  (*See* Dkt. Nos. 119, pp. 4, 40, 77, 119; 119-1, p. 40).

       8)  *White Blood Cell Count and Failure to Test for Sickle Cell Anemia*

According to Defendant, her white blood cell count is low and therefore the BOP should be testing her for sickle cell anemia.  Sickle cell anemia is a "high-risk" condition with respect to COVID-19 according to the CDC.[9]  Defendant told the BOP on May 28, 2020 that she has a "strong family history of sickle cell" and because her white blood cell count was low and her "mother carries the trait", she wanted testing.  (*See* Dkt. No. 119, p. 142).  Defendant has repeatedly denied having sickle cell anemia.  (*See* Dkt. No. 119, pp. 37, 44, 62 [sickle cell trait or disease], 87).  Her white blood cell counts were 4.2 on August 15, 2019, 3.9 on January 21, 2020, and 4.8 on September 3, 2020 (acceptable range is 4.0-11.0).  (*See* Dkt. Nos. 119, pp. 100, 120; 119-1, p. 63).  Thus, after her one count was slightly below the acceptable threshold, Defendant was retested, and her results were back in the normal range.

---

[9] *See* "COVID-19: People with Certain Medical Conditions", Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Feb. 22, 2021).

> 9) *Pre-Diabetes and Failure to Test for Diabetes*

Defendant was diagnosed with pre-diabetes prior to her current incarceration. (*See* Dkt. Nos. 79 [PSI], ¶ 112; 116, p. 71 ["Pre-diabetes . . . A1c 6.4% 8/2016 . . . No signs of neuropathy at this time"]).  Defendant argues that she cannot make certain lifestyle changes to manage this condition and prevent her pre-diabetes from becoming full-blown diabetes, due to the inability to exercise and lose weight, and her diet that is high-calorie and high in processed sugars and carbohydrates.  Defendant further argues that her sugar levels are not routinely tested and she has "very blatant symptoms" of diabetes, including blurry vision and "nocturnal polyuria" (excessive urine production at night), neuropathy (tingling/ numbness in her hands, legs, toes, and feet), and edema (swelling) in her extremities.  She posits that she is unable to prevent her "pending illness" at FPC Alderson and that she is "probably a diabetic by now", but she has been denied "Doppler testing" and compression socks.

Type II diabetes is identified by the CDC as a "high-risk" condition with respect to COVID-19, and Type I diabetes is a possible high-risk condition.  Pre-diabetes, however, is not included in the CDC's list of high-risk conditions.[10]

The Government argues that "Anderson clearly does not have diabetes, and her blood work and medical records are evidence that she is not currently prediabetic.  The BOP is appropriately monitoring her glucose levels, which are at the lower end of the testing range, blood pressure, and cholesterol." (Dkt. No. 118, p. 4).

The medical records reveal that Defendant has repeatedly denied having diabetes.  (*See* Dkt. No. 119, pp. 37, 44, 87).  She has, however, made complaints of a

---

[10] *Id.*

burning and tingling sensation in her extremities, numbness in her legs, and pain/ tingling in her toes. Defendant has also complained of blurry vision. (*See* Dkt. No. 119, pp. 1, 12, 14).

No optometrist was available for routine eye appointments for a period due to the onset of the pandemic. A vision screen had been performed on August 13, 2019; Defendant was counseled to use over-the-counter ("OTC") eyedrops for relief and to return if her blurry vision worsened; and when the pandemic subsided, an optometry exam was performed on November 18, 2020. At the exam, Defendant was diagnosed with "presbyopia"[11] and advised to use "OTC READER +1" (presumably a type of reading glasses). No other issues with her vision were noted. (*See* Dkt. Nos. 119, pp. 14-15, 76, 78-79; 119-1, pp. 5-6, 39, 41).

A medication, Duloxetine, was prescribed for the pain/ tingling in Defendant's toes. (*See* Dkt. Nos. 119, p. 2; 119-1, p. 44). It appears she was also taking Cymbalta for her legs but that she did not like its side effects. (*See* Dkt. No. 119-1, p. 66). Defendant was counseled on consuming less salt and more water, walking, and increasing her level of exercise. Defendant was also given compression socks for her swelling feet. (*See* Dkt. No. 119, p. 12; 119-1, pp. 1-2, 11).

With respect to Defendant's laboratory results from her routine bloodwork, on May 28, 2020, Defendant asked that her "Hemoglobin A1c" be checked again for diabetes because it was lower on two occasions, and she also wanted a "Doppler"

---

[11] "Presbyopia is the gradual loss of your eyes' ability to focus on nearby objects. It's a natural, often annoying part of aging. Presbyopia usually becomes noticeable in your early to mid-40s and continues to worsen until around age 65." *See* "Presbyopia: Symptoms & causes", Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/presbyopia/symptoms-causes/syc-20363328 (last visited Mar. 1, 2021).

11

exam due to the swelling, numbness, and tingling in her extremities.  The provider responded that her blood test levels were "all within normal limits" and that the facility does "not do random A1c.  Especially when your fasting glucose was normal.  Will not order a doppler study – don't have means to do them."  (Dkt. No. 119, p. 142).

On October 15, 2020, Defendant noted muscle cramps in her calves in the mornings and reported decreased water intake, as well as fatigue/ exhaustion.  The provider noted, "ALL HER LABS ARE NORMAL".  (Dkt. No. 119-1, p. 13).  A few days later, on October 19, 2020, Defendant stated she felt light-headed and weak until she ate a piece of candy, and her feet bothered her even after wearing compression socks.  She reiterated her desire to have her A1c checked.  (Dkt. No. 119-1, p. 11).

Dr. Dickenson reports in his email, "Her blood glucose reported with her routine labs has been normal.  There has been no clinical indication for further testing (Hemoglobin A1c)."[12]  (Dkt. No. 119-2).

Defendant's argument that she likely has diabetes that is not being treated because FPC Alderson has not conducted the necessary testing to confirm she has diabetes is unsupported it these records.  Her lay opinion that she may have diabetes is not reliable, especially given the inconsistencies between some of her other complaints and her medical records.  Every symptom that Defendant asserts is an obvious sign she has diabetes has been addressed to some extent by FPC Alderson.  Moreover, the

---

[12] Defendant's lab work indicates the following.  Defendant's Glucose was 80 on August 15, 2019, and 85 on September 3, 2020.  Her results fell within normal range of 70-109.  (*See* Dkt. Nos. 119, p. 119; 119-1, p. 63).  Defendant's Hemoglobin was 11.6 on August 15, 2019, 11.5 on January 21, 2020, and 12.0 on September 3, 2020.  Her results fell slightly below, and later within, the normal range of 12.0-16.0.  (*See* Dkt. Nos. 119, pp. 100, 120; 119-1, p. 63).

12

Court cannot conclude that Defendant's bloodwork, which appears to be routine, is deficient or shows she has diabetes.

If there is a change of circumstances, however, in which Defendant's providers diagnose her with diabetes or if the CDC's guidance were to change to include pre-diabetes as a high-risk factor, Defendant could raise the issue in a second/ renewed compassionate release motion.

    10) *History of Smoking Cigarettes*

The Government questions the veracity of Defendant's statements to the BOP that she smokes or smoked cigarettes.  (Dkt. No. 118, pp. 5, 7).  The Government points to Defendant's prior (2011 to 2017), repeated denials of using tobacco, drugs, or alcohol in comparison to what she has told the BOP (that she frequently smoked cigarettes, and used alcohol, cocaine, and marijuana).  (*Compare* Dkt. No. 116, pp. 63 [denied smoking as of 8/22/2016], 66 [denied smoking as of 1/13/2017], 70 [denied smoking as of 7/3/2017], 74 [as of 7/3/2017, "Patient has never smoked."], 77, 81, 84, 86, 94, 95, 99, 115-116, 121 *with* Dkt. No. 79 [PSI], ¶¶ 115-117 [Defendant reported she began to drink alcohol and use cocaine in 2012, and did so until her arrest in 2018, and reported limited use of marijuana]; and Dkt. No. 119, pp. 46 (smoked marijuana for more than five years, less than 1x per year, and smoked cocaine for 1-5 years, weekly), 50 ("tobacco usage (cigarettes): 0.1 pkgs per day x 5 years" (8/13/2019); 88 ("Yes" to "Alcohol" and "Tobacco products") (8/21/2019).

Smoking ("[b]eing a current or former cigarette smoker), according to the CDC, does increase an individual's risk of severe complications or illness from the virus

13

causing COVID-19.[13] Defendant has not alleged this condition in support of her motion, and because of the conflicting records the Court does not find that her purported smoking constitutes an extraordinary and compelling reason for Defendant's release.

In sum, the Court concludes that Defendant's alleged medical conditions in the context of the pandemic do not constitute an "extraordinary and compelling reason" for compassionate release.

### *Conditions at FPC Alderson*

As to her conditions of confinement, Defendant argues that her incarceration at FPC Alderson (or prison in general) presents an imminent risk to her health during the pandemic. She argues, "FPC Alderson may be doing what they [sic] can, but it is woefully inadequate." (*See* Dkt. No. 111, p. 5). Defendant asserts, among other things, that: the facility is unable to meet social distancing requirements due to population density, the housing units measure 8x10 feet and beds are only 3 feet apart, her unit shares the same ventilation system with 3 other units including the quarantine unit, the facility is not conducting mass or random testing so as to identify asymptomatic cases, the staff move all over the compound and are not tested on a regular basis, some staff do not wear masks or wear them inconsistently, inmates are not given adequate cleaning supplies or hand sanitizers, and Defendant is at a higher risk than other inmates of contracting COVID-19 because her job assignment requires daily contact with staff and inmates.

---

[13] *See* "COVID-19: People with Certain Medical Conditions", Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Feb. 22, 2021).

Defendant further complains that positive cases of COVID-19 have been identified at FPC Alderson, but the facility cannot provide medical care or follow-up care.  For example, requisite safety precautions were allegedly not taken when an inmate returned to the facility from a medical procedure but was returned to Defendant's unit before her 14-day quarantine period was complete, because the facility needed to free up space in the quarantine unit for two other inmates who tested positive.

The Government explains the preventative and mitigation measures taken by the BOP and FPC Alderson in response to the pandemic and compares the rate of confirmed positive cases of COVID-19 with the rate in Erie County, New York, where Defendant proposes to be released.  The Government also notes that FPC Alderson "has already demonstrated its ability to care for inmates and Anderson in particular", when it placed her in two weeks of quarantine and monitored her condition daily after she was identified as a close contact of an individual who contracted the virus, until she tested negative at the end of quarantine.  (*See* Dkt. No. 118, pp. 8-9; Dkt. No. 119-1, pp. 27-30 [asymptomatic for 14 days], 54 and 57 [negative COVID-19 tests on 11/17/2020 and 12/02/2020]).

The Court cannot conclude on this record that Defendant's conditions of confinement constitute an extraordinary and compelling reason for a reduction in sentence.  FPC Alderson has 540 total inmates, and as of the date of this ruling according to the BOP, the facility has 1 inmate with a confirmed active case of the virus and 1 staff, and 17 inmates have tested positive to date.[14]  The Court is aware that

---

[14] *See* "COVID-19: Coronavirus", Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (updated Feb. 26, 2021); see also "FPC ALDERSON", Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/ald/ (last visited Mar. 1, 2021).

these numbers may not account for asymptomatic transmission of the virus.  However, many BOP facilities have coped with outbreaks and have experienced much higher positive case counts than FPC Alderson.  Recognizing the challenge that the pandemic poses to prisons and the measures that FPC Alderson is apparently taking to cope with any positive cases, the Court concludes that the conditions at FPC Alderson are not so dangerous as to present an extraordinary and compelling reason for a reduction in sentence.

Lastly, the Court notes that it does not address any possible *habeas corpus* claim of *pro se* Defendant that the conditions of her confinement violate her Eighth Amendment rights because she is not incarcerated in this District.  *See* 28 U.S.C. § 2241(a); *Rumsfeld v. Padilla*, 542 U.S. 426, 444-445 (2004); *United States v. Wen*, 2020 U.S. Dist. LEXIS 64395, *7 n. 3 (W.D.N.Y. April 13, 2020).

### III.    18 U.S.C. § 3553(a) Factors and Dangerousness

The Government argues that Defendant's motion for release should be denied because the § 3553(a) factors do not weigh in favor of release, and because Defendant presents a danger to others and the community.[15]

Her offense conduct was serious and dangerous.  The Drug Enforcement Administration ("DEA") utilized a confidential source and an undercover agent to make a total of five controlled purchases of crack cocaine from co-defendant, one which included a substance containing fentanyl.  During these purchases, Defendant was

---

[15] The § 3553(a) factors include the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training and treatment in the most effective manner.  *See* 18 U.S.C. § 3553(a).

16

observed in the presence of, and assisting, co-defendant to distribute controlled substances. When a search warrant was later executed at Defendant's residence, DEA agents found additional crack cocaine and a firearm. (*See* Dkt. Nos. 57 [Plea Agreement], ¶ 5 [Factual Basis]; 79 [PSI], ¶¶ 9-16 [Offense Conduct]).

Nevertheless, the Court imposed a variance from the applicable United States Sentencing Guidelines range of 87 to 108 months, after a two-level downward departure for substantial assistance, to 78 months of imprisonment. The variance was based on Defendant's demonstrated remorse, pre-sentence rehabilitation, and family ties and responsibilities. (*See* Dkt. No. 85 [Judgment]; CM/ECF Minute Entry, 07/02/2019; Dkt. No. 86 [Statement of Reasons]; Dkt. No. 96 [Sentencing Tr.]).

Moreover, Defendant's criminal history is somewhat extensive. She was assessed at a U.S.S.G. Criminal History Category III at the time of sentencing. Her convictions include several violations and misdemeanors, as well as two drug-possession related felonies. She was last arrested during pretrial release for the instant offense because, while a cashier at a retail store, she allowed numerous persons to leave without paying for their products. She caused losses in the approximate amount of $7,785 worth of merchandise and was convicted of attempted grand larceny, a Class A misdemeanor under New York law. (*See* Dkt. No. 79 [PSI], ¶¶ 8-11, 63-70).

The Court concludes that early release to home incarceration is not justified, considering Defendant's offense conduct and criminal history. Moreover, Defendant has not yet served a majority of her term of incarceration. (*See* Dkt. No. 116, p. 21 [Computation Data Sheet, showing as of January 28, 2021, Defendant had served 37.5% of the full term of incarceration and 43.4% of the statutory term]; Dkt. No. 118, p.

13 [the Government states that as of February 2021, Defendant has served 31 months of her 78 month-sentence and has 37 months left to serve considering her projected release date of April 2024]). The drug conspiracy charge carries a mandatory minimum sentence of 5 years of incarceration.

In its assessment of the instant motion, the Court has also considered Defendant's other arguments concerning her family circumstances, low pattern score, proclaimed acceptance of responsibility, and rehabilitation efforts. (*See e.g.* Dkt. No. 116, pp. 293-294 [Individualized Needs Program, showing completion of eight educational courses, no incident reports in last six months, and works in food service/ dining]). However, the Court finds that Defendant's history, the seriousness of her offense conduct, and the other § 3553(a) factors weigh strongly against early release.

## CONCLUSION

For the foregoing reasons, Defendant's motion for compassionate release (Dkt. Nos. 88, 116) pursuant to 18 U.S.C. § 3582(c)(1)(A) is denied. Defendant's request for counsel (*see* Dkt. No. 95, p.1) is denied for lack of likelihood of success on the merits. *See Hodge v. Police Officers*, 802 F.2d 58, 60-61 (2d Cir. 1986); *United States v. Garrison*, 2020 U.S. Dist. LEXIS 161544, *1 n.1 (S.D.N.Y. Sept. 3, 2020).

**IT IS SO ORDERED.**

    *s/Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:  March 1, 2021
       Buffalo, New York